UNITED STATES DISTRICT COURT

DISTRICT OF NEW HAMPSHIRE

Elaine Gallagher,
     Plaintiff

     v.                                        Case No. 14-cv-20-SM
                                                      Opinion No. 2015 DNH 179
Unitil Service Corp.,
     Defendant

## O R D E R

Elaine Gallagher brings this action against her former employer, Unitil Service Corp., claiming she was the victim of unlawful discrimination.  Specifically, she says Unitil violated the Americans with Disabilities Act ("ADA") by discriminating against her on the basis of her disability and by refusing to reasonably accommodate that disability.  She also alleges that Unitil unlawfully interfered with her rights under the Family and Medical Leave Act ("FMLA") by failing to provide her with proper notification of her statutory rights and by denying her request for intermittent leave when she returned to work after having received treatment for a serious medical condition.  Finally, she brings a state law claim of disability discrimination under N.H. Rev. Stat. Ann. ("RSA") 354-A, over which she asks the court to exercise supplemental jurisdiction.

Pending before the court is Unitil's motion for summary judgment on all three claims advanced in Gallagher's complaint. Gallagher objects.  For the reasons discussed, that motion is granted.

## Standard of Review

When ruling on a motion for summary judgment, the court must "constru[e] the record in the light most favorable to the non-moving party and resolv[e] all reasonable inferences in that party's favor."  Pierce v. Cotuit Fire Dist., 741 F.3d 295, 301 (1st Cir. 2014).  Summary judgment is appropriate when the record reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In this context, "a fact is 'material' if it potentially affects the outcome of the suit and a dispute over it is 'genuine' if the parties' positions on the issue are supported by conflicting evidence."  Int'l Ass'n of Machinists & Aerospace Workers v. Winship Green Nursing Ctr., 103 F.3d 196, 199-200 (1st Cir. 1996) (citations omitted).  See also Nolan v. CN8, 656 F.3d 71, 76 (1st Cir. 2011).  Nevertheless, if the non-moving party's "evidence is merely colorable, or is not significantly probative," no genuine dispute as to a material fact has been proved, and "summary judgment may be granted."  Anderson v.

Liberty Lobby, Inc., 477 U.S. 242, 249-50 (1986) (citations omitted).

The key, then, to defeating a properly supported motion for summary judgment is the non-movant's ability to support his or her claims concerning disputed material facts with evidence that conflicts with that proffered by the moving party.  See generally Fed. R. Civ. P. 56(c).  It naturally follows that while a reviewing court must take into account all properly documented facts, it may ignore a party's bald assertions, speculation, and unsupported conclusions.  See Serapion v. Martinez, 119 F.3d 982, 987 (1st Cir. 1997).  See also Scott v. Harris, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  Importantly - at least as it relates to this case - the non-moving party cannot create a factual dispute by simply submitting an affidavit or deposition testimony that contradicts his or her earlier sworn testimony without providing an adequate explanation for that discrepancy.  See Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4-5 (1st Cir. 1994). See also Torres v. E.I. DuPont de Nemours & Co., 219 F.3d 13, 20 (1st Cir. 2000).

**Background**

In April of 2010, Unitil hired Gallagher as a temporary systems analyst.  A few months later, she was hired as a full-time, salaried systems analyst/programmer, with benefits.  She worked in Unitil's "Information Systems Department," where she reported to Michelle Gamble who, in turn, reported to Sean Baker. At her deposition, Gallagher testified that she understood that, in her new position, she would be expected to work more than 40 hours per week, if necessary.  And, she often did.

At the end of 2010, Gamble prepared Gallagher's "Performance Appraisal," and gave her a very good (if not excellent) review (a "2" on a scale of 1 to 5, with lower scores being better).  Based upon that positive performance review, Gallagher received a 3.1% salary increase, effective January 1, 2011.  Later that year, Gallagher began working on a sizeable project known as the "Mobile Dispatch System."  Her workload increased and she began working as many as 60 hours per week (occasionally more).  Then, in the fall of 2011, Gallagher learned that she needed abdominal surgery and notified Gamble.

On November 10, 2011, Unitil sent Gallagher a package of materials advising her of her rights under the FMLA.  Two weeks later, Gallagher provided Unitil with a letter from her treating

4

physician stating that she was scheduled for surgery on December 2, 2011, after which she would require approximately six weeks to recover.  Gallagher requested, and Unitil provided, FMLA leave that extended into late January of 2012.  Although Gamble did not prepare a year-end "Performance Appraisal" for Gallagher (apparently because Gallagher was on leave), Unitil again gave her another excellent performance rating.  It also gave her a 3% raise, effective January 1, 2012.

A little more than seven weeks after her surgery, on January 24, 2012, Gallagher returned to work and gave Unitil a note from her doctor that provided:

> Ms. Gallagher was seen and evaluated in our office today, and may return to work this afternoon.  She is still recovering from major abdominal surgery.  She is cleared to return to work, but may work part-time from home at her discretion, for the next two weeks, or until February 13, 2012.

Letter from Anne Shapter, M.D., dated January 24, 2012 (document no. 18-12).  Gallagher admits that, as expressed in that note, her treating physicians expected her to be able to return to a full-time work schedule by Monday, February 13, 2012.  Gallagher Deposition at 83.  She claims, however, that her doctors had placed additional restrictions upon her (such as advising her not to sit for too long, not to gain weight, and not to lift heavy objects).  She says those additional restrictions were conveyed

5

to her orally, but concedes that neither she nor any of her treating physicians shared that information with Unitil, nor did she ask her physicians to convey that information to Unitil. Id., at 84.  After providing Unitil with Dr. Shapter's letter on January 24, Gallagher gave Unitil no additional information from her treating physicians concerning her health, her recovery, the need for work-place accommodations, or her alleged disability.

Gallagher says that during the two week period immediately following her return to work (i.e., when her doctor indicated she might need to work part-time from home, at her option), she approached Gamble "on a few occasions" to say that she was "ready to call it quits for the day."  Gallagher Deposition at 82.  In response, says Gallagher, Gamble "started giving [her] a list of things that had not yet been accomplished."  Id.  From that, Gallagher inferred that she could not (or at least should not) leave the office until that work was completed and, therefore, she did not go home.  But, she did not tell Gamble she needed to rest as a result of her surgery the prior December.  Nor did she remind Gamble of her doctor's recommendation that she be permitted to work from home, if she felt it necessary.  Nor did she speak with anyone else at Unitil about going home and working on a part-time schedule.  Id.  In short, Gallagher gave no indication (to Gamble or anyone else at Unitil) that she was

6

unwilling or unable to return to work on those "few occasions"
she told Gamble she was ready to go home for the day, nor did she
mention any need for rest, nor did she even allude to her alleged
disability.

After February 13, 2012 (i.e., the date her doctor indicated
she could return to full-time work, without restriction),
Gallagher says she often complained that she "was working
excessive work hours," id. at 84, and asked either Gamble or
Baker "if there was something that we could do about maybe
shifting some of the responsibility off to other people that
shared the same title as myself and were certainly capable of
completing some tasks," id. at 90. According to Gallagher,
little was done to reduce her workload. As further evidence of
her difficult working conditions, Gallagher also claims that at
some point in February or March of 2012, Gamble told her, "Why
don't you climb to the roof and jump." Transcript of Appeal
Tribunal Hearing (June 14, 2012) (document no. 18-14) at 25.

According to Gallagher, her repeated complaints about the
number of hours she was working each week, and her calls for
Gamble to re-allocate her work to others, constituted requests
for accommodation under the ADA. She says they also implicitly
amounted to requests for "intermittent leave" under the FMLA.

7

She concedes, however, that she never used the words "accommodation" or "intermittent leave," nor did she ever specifically invoke the ADA or FMLA.  Nor did she ever expressly link her need to assume a lighter workload to her surgery in 2011.  Instead, says Gallagher, because Unitil knew she had undergone abdominal surgery in December of 2011 and because it (allegedly) understood the recovery process was lengthy, Unitil was on notice that she might require some form of accommodation.  According to Gallagher, those accommodations were never forthcoming and her implicit requests for "intermittent leave" under the FMLA were ignored.[1]

---

[1]     Parenthetically, the court notes that while Gallagher repeatedly refers to her "lengthy recovery process" she never specifically states what that entailed or how it affected her ability to work (e.g., prolonged fatigue, inability to concentrate for long periods, etc.).  The only reference she makes in that regard is to her claim that, on more than one occasion, Baker witnessed her experiencing some sort of unspecified pain.  See Gallagher Deposition at 91.  Nevertheless, she asserts that Unitil was "well aware" that her "recovery process" from abdominal surgery could require at least a year.  But, the information provided to Unitil from Gallagher's treating physician certainly suggested that her recovery period would be substantially shorter.  See Letter from Anne Shapter, M.D., (document no. 18-9) ("Recovery after such a surgery is estimated at 6 weeks.").  Dr. Shapter also stated that, during that recovery period, "a treatment/recovery plan will be made if necessary."  Id.  Apparently, such a "recovery plan" was not necessary.  At a minimum, it was not communicated to Unitil, because upon Gallagher's return to work following FMLA leave, the only restriction Dr. Shapter imposed on Gallagher was that she be given the option to work part-time from home for the first two weeks, at Gallagher's election.

8

In late March of 2012, with much (if not all) of the work on the Mobile Dispatch System project complete, Gallagher took a one-week paid vacation.  She returned to work on Monday, April 2.  That day, she spoke with Baker about resigning from Unitil.  At this point, Gallagher's account of the events surrounding her separation from Unitil becomes somewhat inconsistent.  And, she has not adequately explained the reason for her inconsistent recollection of relevant events.  See generally Colantuoni, 44 F.3d at 4-5; Torres, 219 F.3d at 20.

At her deposition, which was taken in January of 2015 (almost three years after her resignation) Gallagher described a conversation with Baker in which she raised issues about her health, the demands that upcoming projects would place on her time, and the "possibility" of resigning.

> So I proceeded to have a conversation with Mr. Baker about the ongoing issues, [which] he was well aware of since I had discussed them with him many times.  And during 2011 and in 2012, you know, expressing my concern that I wasn't able to heal properly, it was going to be a year recovery, as they were aware.  And that I saw the upcoming projects becoming more demanding than the MDS project had already been.  In that conversation, I told Mr. Baker that I didn't see any other options since it had been addressed so many times.  Nothing changed.  Possibly resigning.  We discussed that possibility.

Gallagher Deposition at 98.  In response, says Gallagher, Baker asked her not to resign, told her to take the remainder of the

9

afternoon off so she could rest, and said he would "be back in contact with [her] as to when we would be meeting with HR."  Id. at 99.  Gallagher now claims that the anticipated meeting with human resources was to address "accommodations she needed due to her disability," Plaintiff's Memorandum at 10 – a factual claim unsupported by either her deposition testimony or any other evidence in the record.  Indeed, as discussed below, that claim is contradicted by testimony Gallagher gave more than two years earlier.

During her unemployment benefits hearing, which was held in June of 2012 – about two months following her separation from Unitil – Gallagher's testimony was decidedly different.  She testified that, on April 2, 2012, she unequivocally informed Baker that she intended to resign, effective immediately.  In response, Baker "asked if I could hold off on my resignation being effective immediately because there were some exit interviews that HR wanted to go through and there were some other processes."  Transcript of Appeal Tribunal Hearing (June 14, 2012) (document no. 18-14) at 33.  Gallagher further testified as follows:

> Question:  So you originally told him that you were resigning immediately?

Answer:      But then he convinced me not to do that.  He
             asked me and as a professional courtesy I did
             say that I would continue to stay on.

                        *  *  *

Question:    What was it that he wanted you to stay on for,
             to do what?  Something specific?

Answer:      <u>Just to hand things over and make sure
             everything was in good order, have my exit
             interview with Kim</u>.

<u>Id.</u> qt 33-34 (emphasis supplied).  Baker testified similarly,

saying that Gallagher was very clear that she intended to resign

immediately, without the traditional two weeks' notice.

    I remember her saying specifically, "I'm not giving two
    weeks' notice" as being important, near the beginning
    of the conversation, and I can't say the exact wording,
    but I know that was a concept introduced: There will be
    no notice.

                        *  *  *

    I told her that it's not - she was not going to be
    required to come back and sit in her chair for two
    weeks; that she could still leave on professional terms
    in a way that was comfortable to her that we could work
    out together to just accomplish what needs to be done
    for everyone's benefit.

Deposition of Sean V. Baker (document no. 21-5) at 51.


    Gallagher testified that Baker did not say exactly how long

he wanted her to remain at Unitil, but she left "with the

understanding that [Baker] would be in contact with [her] to

provide [her] with a follow-up as to what needed to take place."

Transcript of Appeal Tribunal Hearing, at 34.  When asked how
long she would have been willing to delay the effective date of
her resignation, Gallagher said she "would have stayed two weeks,
a month.  It would have been whatever they needed for me to do."
Id. at 35.  At that hearing, Gallagher did not mention any
conversation with Baker about her health issues, unfulfilled
requests for accommodation, or proposed future accommodations.
Instead, when asked why she was resigning, Gallagher stated that
she felt her relationship with Gamble "continued to deteriorate,"
she had not received her annual review, she felt she lacked job
security and feared an upcoming project would be phased out, and
she believed she was working excessive hours.  See Id. at 14.


     The day after she spoke with Baker, Gallagher says she
realized that "something got lost in translation."  Id. at 35.
While Gallagher was preparing for work, Gamble called her and
left a message on her phone.  In it, she asked Gallagher to
return her work-related equipment and to submit a formal
resignation letter.  See Gallagher Deposition at 103.  But, to
the extent Gallagher felt there had been some misunderstanding
about the timing of her resignation (or even whether she planned
to resign at all) or whether Baker had pledged to speak with
human resources about accommodations to her schedule or
"intermittent leave" under the FMLA, she did not make any effort

12

to correct Gamble's (allegedly) mistaken view.  <u>See</u>, <u>Id.</u>
(Question: "You didn't say, 'Michelle, gosh, there's a
misunderstanding; I'm not resigning,' correct?"  Answer: "No, I
did not.").


Instead, Gallagher prepared and submitted to Gamble a
lengthy e-mail in which she announced her resignation from
Unitil, effective immediately.  In it, she wrote:

> I received your voice mail this morning regarding my
> resignation.
>
> In speaking with Sean yesterday, it was my
> understanding that he would be sending me an email
> informing me as to when I should come in <u>to finalize my
> resignation/departure</u>.  He further stated that he
> needed to get everything organized with HR and our
> department and asked that I give time for those tasks
> to be completed.
>
> The following will serve as my official resignation at
> your request as well as a follow up to the conversation
> I had yesterday with Sean.  I apologize that you were
> not there to participate in the conversation.
>
> I sincerely appreciate the opportunity to work with
> Unitil however, I find it necessary to resign my
> position as a staff employee effective immediately.
>
> I do not take this decision lightly and have thought
> about it in depth but find this decision to be in my
> best interest at this point in my personal and
> professional life.
>
> I believe that it's a good time for both Unitil and
> myself to resign as I have just completed the MDS
> project and have not yet engaged in another project
> full time.

> I will be available for consulting if Unitil finds it necessary to engage my assistance and welcome any opportunity to assist.  My contract rate is $65.00/hr.
>
> I will sincerely miss everyone in the group as I have found working with everyone here to be both enjoyable and rewarding.
>
> As always, I can be reached on my cell phone: 978-XXX-XXXX.
>
> My pager has been left on my desk.  I will return my laptop and badge when my final paycheck is ready for pickup <u>and the exit interview has been scheduled per Sean's request</u>.
>
> I await your phone call or email for further instructions.

Resignation Letter dated April 3, 2012 (document no. 18-2) (emphasis supplied).  Again, Gallagher made no mention of Baker's alleged pledge to make accommodations to her schedule under the ADA or grant what she calls an implicit request for "intermittent leave" under the FMLA.  Instead, Gallagher's letter makes clear that the anticipated meeting with human resources was "to finalize [her] resignation/departure" and to make certain there was an orderly transition of her work to others in the department.  Viewed more broadly, that letter paints a picture of someone who had enjoyed the time she spent working at Unitil; "found working with everyone [there] to be both enjoyable and rewarding"; would "welcome the opportunity" to return on a consulting basis; had carefully considered both the fact and

14

timing of her resignation; and decided for both "personal and professional" reasons, it was time to move on.

Gallagher's subsequent efforts to secure unemployment benefits were apparently unsuccessful.  This litigation ensued.

## Discussion

### I.   Federal Claims

A.   The ADA and Retaliatory Discharge.

Gallagher first claims that she was fired (or constructively discharged) in retaliation for having invoked her right to receive a reasonable workplace accommodation of her disability under the ADA.  See, e.g., Plaintiff's memorandum at 1 ("[Plaintiff] was terminated, or in the alternative, constructively discharged, for requesting reasonable accommodation of her disability.").  That claim lacks a factual basis in the record.

In support of her view that Unitil fired her, Gallagher says her resignation was not voluntary and, instead, that she was compelled to submit it by Gamble (who left the message on Gallagher's phone about submitting a formal letter of resignation).  See, e.g., Plaintiff's memorandum at 18 (stating that Baker "assured" her she would remain employed and asserting

- somewhat paradoxically - that, after submitting her resignation letter, she "attempted to hold onto her job, by trying to meet with HR, emailing and calling HR, and completing the exit interview").[2]

Again, Gallagher's position is not supported by the record - indeed, both her letter of resignation and her "Exit Interview" reveal that she gave substantial thought to the matter and, after reflection and due consideration, arrived at the decision to resign, effective immediately.  See, e.g., Resignation Letter (document 18-2) ("I do not take this decision lightly and have thought about it in depth, but find this decision to be in my best interest at this point in my personal and professional life. I believe that it's a good time for both Unitil and myself to resign as I have just completed the MDS project and have not yet engaged in another project full time.").  See also Exit Interview (document no. 21-8) at 2 ("Although leaving 'immediately' may sound harsh, this was well thought out and planned based on my completion of the MDS project in conjunction with the fact that I had not yet started any other projects.  All incomplete tasks

---

[2]     Gallagher's "Exit Interview" is actually a document that Unitil e-mailed to her, following her resignation. According to her deposition testimony, Gallagher "took a couple weeks, filled that out, [and] sent it back to [human resources]." Gallagher deposition at 110.  It is, therefore, entirely unclear how completing that document constituted an "attempt to hold on to her job."  Plaintiff's memorandum at 18.

were well documented so that they could be easily transferred to another resource.").

As the record indisputably reveals, Gallagher resigned from her position at Unitil; she was not fired.  As a fallback position, however, Gallagher claims she was "constructively discharged" – that is, she says she was forced to endure conditions of employment so intolerable that a reasonable person in her position would see no plausible alternative except to resign.  But, it is unlikely that the conditions of employment identified by Gallagher were so intolerable as to meet that rather high legal threshold.  See generally Porter v. City of Manchester, 151 N.H. 30, 42 (2004) (noting that the intolerable conditions of employment must be "ongoing, repetitive, pervasive, and severe.").  See also Suarez v. Pueblo Int'l, Inc., 229 F.3d 49, 54 (1st Cir. 2000) ("The workplace is not a cocoon, and those who labor in it are expected to have reasonably thick skins – thick enough, at least, to survive the ordinary slings and arrows that workers routinely encounter in a hard, cold world.  Thus, the constructive discharge standard, properly applied, does not guarantee a workplace free from the usual ebb and flow of power relations and inter-office politics.").

It is, then, unlikely that Gallagher could demonstrate that she was constructively discharged.  But, even if she could surpass that hurdle and show that the conditions of her employment were atypically onerous and harsh, Gallagher has failed to point to sufficient record evidence to support her retaliation claim.  Specifically, she has not identified evidence that might support the conclusion that she was constructively discharged <u>because</u> of her disability.  In other words, she has not pointed to evidence suggesting that Unitil imposed upon her intolerably difficult working conditions because of (or somehow in relation to) her alleged disability – an essential element of her disability retaliation claim.  <u>See, e.g.</u>, <u>Kelley v.</u> <u>Correctional Med. Services</u>, 707 F.3d 108, 115 (1st Cir. 2013) ("To make out a prima facie retaliation claim, the plaintiff must show that: (1) she engaged in protected conduct; (2) she experienced an adverse employment action; and (3) <u>there was a</u> <u>causal connection between the protected conduct and the adverse</u> <u>employment action</u>.") (emphasis supplied) (citation and internal punctuation omitted).  Simply stated, there is a dearth of evidence suggesting a causal connection between Gallagher's alleged disability and any adverse employment action by Unitil. More specifically, Gallagher has failed to identify evidence suggesting that, in response to (or in retaliation for) her (implicit) requests for accommodation, Unitil decided to force

18

her to resign by making her working conditions intolerable by any reasonable person.

Gallagher's constructive discharge/retaliation claim warrants little further discussion.  When viewed in isolation, Gallagher's factual assertions and legal arguments are quite compelling.  But, when considered in light of the actual evidence presented in this record, those arguments dissolve into little more than creative thinking.  Consequently, Unitil is entitled to judgment as a matter of law on Gallagher's ADA retaliation claim.

B.   <u>The ADA - Failure to Accommodate</u>.

Next, Gallagher asserts that Unitil violated the ADA because it "was aware of her disability and failed to provide her reasonable accommodation."  Plaintiff's memorandum at 1. Although she acknowledges that she never formally requested an accommodation of her claimed disability, she says Unitil was sufficiently aware of her disability to impose upon it the obligation to inquire into whether she required some sort of accommodation.  Again, if that claim were supported by the factual record, it would be quite compelling.  But, a careful review of the facts presented in this case reveals that Gallagher's claim lacks merit.

The ADA prohibits employers from discriminating against a qualified individual with a disability.  See 42 U.S.C. § 12112(a).  The Act defines a "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  Id. § 12111(8).  A "disability" includes "a physical or mental impairment that substantially limits one or more major life activities."  Id. § 12102(2)(A).  And, finally, "substantially limits" means that the person cannot perform a major life function or is "significantly [limited in] the condition, manner or duration under which [the] individual can perform a particular major life activity, as compared to the average person in the general population."  29 C.F.R. § 1630.2(j)(ii).

Here, it is entirely unclear whether Gallagher even meets the threshold of having a "disability."  Aside from referencing her abdominal surgery in 2011 and the medical leave she received immediately thereafter, she has not attempted to explain the nature or contours of her asserted disability or how it substantially limits a major life activity (for example, although she was not happy about it, Gallagher was able to meet Unitil's requests that she work a substantial number of hours each day for extended periods of time).  Instead, she merely asserts Baker

20

witnessed her "walking out of [her] cubicle holding onto the wall due to pain.  And we had conversations about being in pain." Gallagher deposition at 91.  That Gallagher was uncomfortable or even experiencing some pain on one or more occasions does establish that she was "disabled," as that term of art is used in the ADA.

Nevertheless, even assuming (without deciding) that she was, at all times relevant to this litigation, disabled, the record does not support her claim that Unitil failed to honor its obligations under the ADA to accommodate that disability.  See generally 29 C.F.R. § 1630.2(j)(1)(iii) ("[T]he threshold issue of whether an impairment 'substantially limits' a major life activity should not demand extensive analysis.").  As the court of appeals for this circuit has explained:

> Where a plaintiff alleges a failure to accommodate, the plaintiff must show that the employer knew about plaintiff's disability and did not reasonably accommodate it. . . . A plaintiff must explicitly request an accommodation, unless the employer otherwise knew one was needed.  An accommodation request must be sufficiently direct and specific, and it must explain how the accommodation is linked to plaintiff's disability.  The obligation is on the employee to provide sufficient information to put the employer on notice of the need for accommodation.  This means not only notice of a condition, but of a causal connection between the major life activity that is limited and the accommodation sought.

Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 89 (1st Cir. 2012) (emphasis supplied) (citations and internal punctuation omitted).  See also Reed v. LePage Bakeries, Inc., 244 F.3d 254, 261 (1st Cir. 2001) ("The employee's request must be sufficiently direct and specific, giving notice that she needs a special accommodation.  At the least, the request must explain how the accommodation requested is linked to some disability."); Bellerose v. SAU No. 39, 2014 WL 7384105 at *5, 2014 DNH 265 at 13 (D.N.H. Dec. 29, 2014) ("Typically, the ADA's reasonable accommodation requirement is not triggered until the employee makes a request because an employee's disability and concomitant need for accommodation are often not known to the employer until the employee requests an accommodation.") (citation and internal punctuation omitted).  See generally 42 U.S.C. § 12112(b)(5)(A) (imposing liability on employers for failing to reasonably accommodate "known physical or mental limitations") (emphasis supplied).  Cf. 29 C.F.R. § 825.301 ("An employee giving notice of the need for FMLA leave does not need to expressly assert rights under the Act or even mention the FMLA to meet his or her obligation to provide notice, though the employee would need to state a qualifying reason for the needed leave and otherwise satisfy the notice requirements set forth in § 825.302 or § 825.303 depending on whether the need for leave is foreseeable or unforeseeable.") (emphasis supplied).

Perhaps most importantly (at least as the ADA relates to
this case), the court of appeals has specifically held that, "The
employer has no duty to divine the need for a special
accommodation where the employee merely makes a mundane request
for a change at the workplace." Reed, 244 F.3d at 261.  When
Gallagher asked Gamble to reduce the number of hours she was
expected to work and/or to transfer some of her work to others in
the department, that constituted just such a "mundane request for
change at the workplace."  Even though Unitil knew that Gallagher
had undergone surgery in December of 2011, Gallagher's requests
relating to (and complaints about) her working hours were not
sufficient to cause Unitil to even suspect that she was invoking
her rights under the ADA.  Nor could Unitil have reasonably
inferred that Gallagher's requests for fewer working hours were
linked to a qualifying disability, or even some extended recovery
period associated with her abdominal surgery.

Gallagher disagrees, asserting that Unitil was actually
aware of both her disability and her need for an accommodation
(in the form of reduced hours).  In support of that view, she
says that the vague reference in her resignation letter to her
understanding that Baker needed to "get everything organized with
HR" was actually an allusion to a plan that she and Baker had
worked out, under which: (1) she agreed not to resign; (2) Baker

23

agreed to set up a meeting with himself, "HR, and potentially
Gamble, to discuss accommodations [Gallagher] needed due to her
disability and serious health conditions, which would allow her
to continue working." Plaintiff's memorandum (document no. 21-1)
at 10 (emphasis supplied). Then, says Gallagher, in retaliation
for having mentioned her need for accommodation with Baker at
that meeting, Unitil "forced" her to submit a letter of
resignation. Id. at 13. See also Complaint at para. 28 ("When
plaintiff addressed the lack of accommodation with her
supervisors, she was terminated.").


    That construction of the record is simply not supported by
anything before the court – including Gallagher's own sworn
testimony. See, e.g., Transcript of Appeal Tribunal Hearing, at
33 ("And [Baker] asked if I could hold off on my resignation
being effective immediately because there were some – there were
some exit interviews that HR wanted to go through.").
In the written document Gallagher prepared a few weeks after
resigning (i.e., her "Exit Interview"), Gallagher described the
circumstances surrounding her meeting with Baker as follows:

    I had initially given [Baker] my notice in [Gamble's]
    absence and had agreed to stay on to go through the
    process of the exit interview and such. [Baker] told
    me I could leave for the remainder of the day – it was
    already afternoon by that time. He stated that he
    would send me an email instructing me what the final
    arrangements were. I never received an email from Sean

> but instead a phone call from [Gamble] and subsequent
> voice mail asking me to return my badge, page, laptop,
> etc. <u>I SINCERELY wanted my opportunity for an exit
> interview</u>.

Unitil Exit Interview (document no. 21-8) at 3-4 (emphasis in

original). Contrary to plaintiff's current assertions, nothing

in that written statement remotely suggests that Baker pledged to

meet with human resources "to discuss accommodations she needed

due to her disability and serious health conditions," or that she

or Baker anticipated that she would continue working at Unitil

beyond a brief transition period, or that she believed she was

forced to resign in response to a request for accommodation or

additional leave.


    In a related argument, Gallagher also points to her written

"Exit Interview" as evidence of her having repeatedly asked

Gamble for accommodations of her alleged disability. Plaintiff's

memorandum at 13 ("In her exit interview, Gallagher reported to

[human resources] that <u>Gamble ignored her requests for

accommodations upon her return from surgery</u>. Although Gallagher

had some other minor issues with Unitil, she had been working

through them.") (emphasis supplied). Again, however, the record

does not support Gallagher's position - particularly her

assertion that Gamble ignored her "requests for accommodations."

In her "Exit Interview," Gallagher went on at great length describing the "issues" she had with her employment at Unitil. She began by saying:

> First, I would like to say that I am going to genuinely miss working with the development team at Unitil.  I sincerely enjoyed working with the entire team as I know that having a team that 'gets along well' and 'gets things done' isn't always easy to find in a working environment.
>
> I am also deeply saddened by my decision to leave but with the circumstances, I felt it was necessary and my only option as I have tried to resolve these issues that surround my displeasure regarding my employment at Unitil.

Exit Interview at 2 (emphasis supplied).  She then chronicled, in substantial detail, the precise nature of those "issues" – a series of displeasures with her working environment, including: the lack of technical knowledge possessed by her supervisor, Gamble; the lack of trust from Gamble; that Gamble would make commitments for project deadlines without consulting her; poor communication from Gamble; that she was excluded from meetings she thought she should have attended; that she never received her 2011 performance review; that she felt she had little job security and feared her job would be "phased out"; inappropriate contact she believed Gamble had with her landlord; and what she eventually perceived to be "disdain" that Gamble showed toward

her – illustrated by Gamble allegedly once telling Gallagher "why
don't you just climb to the roof and jump."[3]

To be sure, Gallagher did make reference to her concern that
she was being over-worked, claiming she complained to Gamble
several times about the number of hours she was working each
week.  Id. at 3.  Contrary to the representations in her legal
memorandum, however, she did not make any reference to a request
for an accommodation of any disability; she merely stated that
she complained about her hours and was repeatedly reassured that
she would receive "comp time" in return.  And, when Gallagher
learned that she was being given three days of comp time, she
complained that it was not sufficient.  See Exit Interview at 3.
When she confronted Baker, he said he wasn't familiar with the
company's policy on comp time, but assured Gallagher he would
look into it.  Gallagher says Baker never followed through on
that pledge; nor, apparently, did she follow through in any
meaningful way.  Id.

---

[3]     Consistent with what Gallagher described as her
"issues" with Unitil, Baker testified that he was aware that
Gallagher had complained about various aspects of her employment.
"I remember that they were very general complaints that went up
and down.  Sometimes there were no complaints and sometimes there
were complaints indicative of a typical person who was having a
bad day.  Nothing specific."  Deposition of Sean V. Baker
(document no. 21-5) at 32.

The point is this: the record (including Gallagher's performance reviews) suggests that Unitil viewed Gallagher as a highly capable employee and relied heavily upon her - apparently more heavily than it relied upon other, perhaps less capable, people in her department.  And, when presented with a demanding work schedule that required her to work many hours each week for a sustained period of time, Gallagher asked if some of her work could be shifted to other employees and then disputed the amount of comp time to which she was entitled.  There is, however, no suggestion in the record that either she or any agent of Unitil believed (or should have believed) that she needed, or was entitled to, an accommodation of some disability.  Nor is there any evidence that she actually sought, but was denied, an accommodation.

The last communication from Gallagher's treating physician indicated that she could perform the tasks associated with full-time employment within two weeks of her return to work.  And, during those initial two weeks, Gallagher's physician merely stated she should be allowed to pace herself and work from home, if she felt it necessary.  While she claims Gamble placed heavy (if not unreasonable) demands upon her during those two weeks, Gallagher testified that she simply accepted the assignments and returned to work, without further comment.  Gallagher Deposition

28

at 82.  There was no indication that she required any type of

ongoing accommodation of some disability, nor did she ever

request one.  Nor, did she ever link her requests for a lighter

workload to an inability to perform her job due to her alleged

disability or what she claims was a lengthy recovery period

following her surgery in 2011.[4]

Gallagher's claim that Unitil failed to properly accommodate

her disability under the ADA is without merit.  So too is her

claim that Unitil was obligated (but failed) to engage in some

interactive process with her in an effort to find appropriate

accommodations.  As the court of appeals has noted, to

demonstrate that an employer failed to provide a reasonable

accommodation, "the employee must prove that the request was

---

[4]     Gallagher's legal arguments are simply inconsistent
with the record evidence.  For example, as noted above, she
testified that, during the two-week period immediately following
her return to work (when her doctor recommended that she be
permitted, at her option, to work from home), she "approached
[Gamble] on a few occasions [and said] that I was ready to call
it quits for the day.  She started giving me a list of things
that had not yet been accomplished."  In response, Gallagher said
she simply, "didn't try to leave."  Gallagher deposition at 82.
According to her counsel, that brief interaction between
Gallagher and her supervisor - in which Gallagher did not push
back, ask if the tasks could be completed either from home or the
following day, or request that they be assigned to someone else -
"constitutes a denial of her accommodation," since Gallagher was
"exceeding her doctor mandated work hours, which were both an
accommodation and intermittent leave [under the FMLA]."
Plaintiff's memorandum at 6.  That argument misconstrues the
facts of record, and the legal conclusions Gallagher draws from
her misunderstanding of the material facts are incorrect.

sufficiently direct and specific so as to put the employer on notice of the need for an accommodation." Enica v. Principi, 544 F.3d 328, 338 (1st Cir. 2008) (citations omitted). Only after giving an employer notice of the need for an accommodation, "in some cases," such a request "may trigger a duty on the part of the employer to engage in an interactive process." Id. See also E.E.O.C. v. Kohl's Dep't Stores, Inc., 774 F.3d 127, 132 n.5 (1st Cir. 2014) ("This court does not regard an employer's participation in the interactive process as an absolute requirement under the ADA. Instead, we have held that we resolve the issue on a case-by-case basis.") (citation and internal punctuation omitted).

Here, however, Gallagher made no such "direct and specific" request for accommodation, nor can Unitil be charged with knowing that she needed an accommodation for her alleged disability. Consequently, her failure-to-accommodate claim under the ADA fails as a matter of law.

C.   Interference Rights under the FMLA.

Next, Gallagher asserts that Unitil violated the FMLA when it "did not provide her with proper FMLA paperwork and did not provide her with intermittent or part-time leave that her health care provider requested under the FMLA." Plaintiff's memorandum

30

(document no. 21-1) at 24.  <u>See also</u> Plaintiff's Sur-reply
(document no. 23) at 4 ("Gallagher has always claimed that she
was not given the reduced hours which her doctor's note required,
and that subsequent to February 12th her verbal requests [for
leave under the FMLA] both went unheeded, and Defendant never
provided the required forms.").

An employee is generally entitled under the FMLA to take up
to 12 weeks of leave "because of a serious health condition that
makes the employee unable to perform the functions of the
position of such employee."  29 U.S.C. § 2612(a)(1)(D).  An
employer may not interfere with, restrain, or deny the exercise
by employees of the rights conferred by the FMLA, and may not
discriminate against an employee for having exercised those
rights.  29 U.S.C. § 2615(a)(1) and (2); <u>see</u> <u>generally</u> <u>Hodgens v.</u>
<u>General Dynamics Corp.</u>, 144 F.3d 151, 159-60 (1st Cir. 1998).
"Nor may employers 'use the taking of FMLA leave as a negative
factor in employment actions, such as hiring, promotions or
disciplinary actions."  <u>Hodgens</u>, 144 F.3d at 160 (quoting 29
C.F.R. § 825.220(c)).

Here, Gallagher asserts that her FMLA claim is one based
upon Unitil's "interference with her FMLA rights."  Plaintiff's
Sur-reply at 4.  Section 2615 of Title 29 of the United States

Code, which is entitled "Prohibited Acts," provides, in relevant

part, as follows:

>     (a) Interference with Rights
>
>> (1) Exercise of rights
>>
>>> It shall be unlawful for any employer to
>>> interfere with, restrain, or deny the exercise
>>> of or the attempt to exercise, any right
>>> provided under this subchapter.
>>
>> (2) Discrimination
>>
>>> It shall be unlawful for any employer to
>>> discharge or in any other manner discriminate
>>> against any individual for opposing any practice
>>> made unlawful by this subchapter.

29 U.S.C. § 2615(a). Gallagher appears to claim that Unitil

violated that statute in two ways: first, by denying her request

for "intermittent leave" by failing "to provide further forms

when she asked for reduced hours in January through March 2012,"

Plaintiff's Reply Memorandum at 4; and, second, by failing "to

notify her that her leave was designated as FMLA leave time," Id.

Ultimately, however, to prevail on her claim that Unitil

unlawfully interfered with her FMLA rights, Gallagher must

demonstrate that: (1) she was eligible for the FMLA's

protections; (2) Unitil was covered by the FMLA; (3) she was

entitled to leave under the FMLA; (4) she gave Unitil notice of

her intention to take leave; and (5) Unitil denied her FMLA

benefits to which she was entitled.  See, e.g., Carrero Ojeda v. Autoridad de Energia Electrica, 755 F.3d 711, 722 n.8 (1st Cir. 2014).  Largely for the reasons discussed above, Gallagher cannot point to sufficient evidence in the record to warrant the conclusion that Unitil violated any of her rights under the FMLA.

In support of her FMLA claim, Gallagher says she was not given the reduced hours that her doctor's note required and her requests for FMLA leave were ignored.  Plaintiff's Sur-reply Memorandum at 4.  But, as noted above, the letter from her treating physician did not "require" reduced hours.  Instead, it provided that, for two weeks after Gallagher's return to work, Unitil should allow her to work a reduced schedule, if Gallagher felt it necessary.  Letter from Anne Shapter, M.D., dated January 24, 2012 (document no. 18-12) ("She is cleared to return to work, but may work part-time from home at her discretion, for the next two weeks.").  Plainly, during that two week period, the onus was on Gallagher to inform Unitil if, consistent with her doctor's recommendation, she believed she needed to work fewer hours, either at work or from home.  She did nothing of the sort.  The only evidence on that point she identifies is the conversation she claims to have had with Gamble, in which she said she planned to go home for the evening, Gamble responded by identifying work that had yet to be completed, and Gallagher simply returned to

33

her desk.  See Gallagher Deposition at 82.  No matter how generously one views the record evidence, that interaction cannot plausibly be viewed as an invocation of her rights under the FMLA.

And, for the same reasons that Unitil cannot be charged with knowledge that Gallagher required some sort of accommodation under the ADA, it cannot be charged with knowledge that she required additional leave under the FMLA.  Again, Gallagher never asked for such leave.  Instead, she suggests that Unitil should have inferred that she needed FMLA leave.  For the reasons discussed above, the court disagrees.

Finally, Gallagher makes much of the alleged confusion over the forms that Unitil provided to her when she formally notified it of her need to take time away from work for her abdominal surgery.  See, e.g., Plaintiff's Memorandum at 24-25 ("Unitil interfered with [Gallagher's] ability to meaningfully exercise her rights when it failed to properly designate her leave and notify her of her rights, and by making a botched request for a workers' compensation blanket release to secure her complete medical record, rather than only the medical information it was entitled to if it had a question about her condition.").  In support of her view that Unitil's conduct violated the law,

34

Gallagher points to 29 C.F.R. § 825.300, which describes the
notice employers must provide to employees about their FMLA
rights, as well as employers' obligation to notify employees
whether "leave will be designated and will be counted as FMLA
leave."

But, as Gallagher herself acknowledges, to prevail on her
"interference" claim, she must demonstrate that "she provided
sufficient notice of her intent to take leave and her employer
denied her FMLA benefits to which she was entitled."  Plaintiff's
memorandum at 24 (citing Pagel v. TIN, Inc., 695 F.3d 622, 627
(7th Cir. 2012)).  That, she cannot do.  For example, in her
deposition, Gallagher admitted that she received all FMLA leave
she requested.  See Gallagher Deposition at 74.  She also admits
receiving written information from Unitil describing its
policies, as well as her rights, under the FMLA.  See Unitil
System Policy - Family and Medical Leave (document no. 21-9).
That document notified Gallagher of her right to receive up to 12
weeks of leave, the conditions under which such leave was
available, and the fact that such leave "may be taken in a single
block of time, or spread out over several days or weeks within a
12 month period."  Id. at 2.  It also specifically informed her
of the right to take an "intermittent or reduced leave schedule."
Id. at 4.  Parenthetically, the court notes that Unitil's policy

35

also provided that, whenever possible, an employee shall submit a request for FMLA leave in writing, to his or her supervisor – something Gallagher plainly did not do.

There is no dispute that Unitil sent Gallagher a package of materials informing her of her rights under the FMLA and the details of Unitil's FMLA leave policy. Gallagher apparently takes issue with the fact that the package also included what Gallagher says was a "worker's comp medical release." Unitil's human resources person testified that she routinely sent such releases, as part of the FMLA packet, saying "it's a release to obtain a second opinion, if needed." Deposition of Kimberlee Rummler (document no. 21-6) at 46. That would appear to be consistent with Unitil's FMLA policy, which provides that, in some circumstances, Unitil may seek a second medical opinion (at company expense). <u>See</u> System Policy – Family and Medical Leave, at 5 ("If the FMLA leave is for the employee's own Serious Health condition or to care for a [family member], the company may require a second medical opinion and periodic certification at its own expense.").

In a related claim, Gallagher suggests that Unitil violated the FMLA by failing to properly account for her leave time and/or neglecting to inform her that such time was being treated as

36

leave under the FMLA.  But, the paperwork included in the package
sent to Gallagher was provided in order to meet Unitil's
obligations under the FMLA and its implementing regulations.
See, e.g., 29 C.F.R. § 825.301 ("Designation of FMLA Leave").
See also Unitil System Policy - Family and Medical Leave, at 9-
23.  But, as Gallagher acknowledges, she "declined to complete
the paperwork" because she believed some of the documents had
been sent to her in error.  Defendant's memorandum at 16 (quoting
plaintiff's response to interrogatories).  See also Gallagher
deposition at 73.  Nevertheless, Unitil still afforded her the
requested FMLA leave time and, importantly, Gallagher
acknowledged receiving all FMLA leave that she sought.  Id. at
74.  It is, therefore, difficult to understand precisely how
Gallagher believes (or, perhaps more accurately, how she might
prove) that she was harmed.

     Little more need be said.  Gallagher's FMLA claim - in all
its iterations - lacks factual support in the record.  Unitil is,
therefore, entitled to summary judgment.


## II.  State Law Claim - N.H. Law Against Discrimination

     Neither party disputes that the court may (and should)
exercise supplemental jurisdiction over Gallagher's state law
claim under New Hampshire's Law Against Discrimination, N.H. Rev.

Stat. Ann. ("RSA") 354-A.  <u>See generally</u> 28 U.S.C. § 1367.  <u>See</u>
<u>also</u> <u>Camelio v. American Fed'n</u>, 137 F.3d 666, 672 (1st Cir.
1998).

     As Gallagher acknowledges, her claim under RSA 354-A is
analyzed using the same legal framework as her ADA claim.  <u>See</u>
Plaintiff's Memorandum at 14.  <u>See also</u> <u>Andersen v. Dartmouth</u>
<u>Hitchcock Med. Ctr.</u>, 2015 WL 847447, at *7 (D.N.H. Feb. 26,
2015).  To satisfy one of the essential elements of that claim,
Gallagher must point to sufficient evidence in the record to
warrant the conclusion that "her employer took an adverse
employment action against her because of, in whole or in part,
her protected disability."  Plaintiff's Memorandum at 15 (citing
<u>Tobin v. Liberty Mut. Ins. Co.</u>, 433 F.3d 100, 104 (1st Cir.
2005)).

     For the reasons stated above, a rational and properly
instructed jury reviewing the record evidence could not, as a
matter of law, conclude that Unitil discriminated against
Gallagher on the basis of her alleged disability, nor could it
conclude that Unitil fired (or constructively discharged)
Gallagher for any reason relating to that disability.
Consequently, as to Gallagher's discrimination claim under RSA
354-A, Unitil is entitled to judgment as a matter of law.

**Conclusion**

Read in isolation, Gallagher's complaint and her legal memoranda paint a fairly compelling picture of an employee who worked a grueling number of hours each week, provided thankless dedication to her job, endured an exploitative supervisor, and suffered the painful effects of unlawful workplace discrimination - all culminating in her actual or constructive discharge. Plainly, however, her legal claims against Unitil cannot be analyzed in a vacuum and must find some measure of support in the evidentiary record.  They do not.

For the foregoing reasons, as well as those set forth in Unitil's legal memoranda, Unitil is entitled to judgment as a matter of law on all three claims advanced in Gallagher's complaint.  Its motion for summary judgment (document no. 18) is, therefore, granted.

The Clerk of Court shall enter judgment in accordance with this order and close the case.

**SO ORDERED.**

Steven J. McAuliffe
United States District Judge

September 17, 2015

cc:  Leslie H. Johnson, Esq.
     Christopher J. Pyles, Esq.

39